UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No. 4:06CR00160 SNL (AGF) |
| GARY L. GRAY, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motion filed by Defendant, Gary L. Gray. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress physical evidence. (Doc. No. 25). An evidentiary hearing was held on May 11, 2006. The government was represented by Assistant United States Attorney Dean R. Hoag. Defendant was present and represented by his attorney, Stephen R. Welby. At the hearing, the government presented the testimony of Deputy Raymond Pracht, who serves as a Reserve Deputy for the Phelps County and Franklin County Sheriff's Departments, and Detective Dewey A. Davis, who is employed as a Detective with the Phelps County Sheriff's Department. The witnesses were cross-examined extensively by defense counsel. The parties were given leave to file post-hearing memoranda, after which the matter was taken under submission. Trial is scheduled for June 26, 2006.

Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

On March 5, 2006, Dep. Pracht was on duty as a Reserve Deputy for the Phelps County Sheriff's Department, assigned to traffic and criminal interdiction duty at the Sugartree exit on Interstate Highway 44. As a Reserve Deputy, he was authorized to issue tickets for traffic violations. Consistent with the practice of the Phelps County Sheriff's Department when conducting interdiction at this location, the officers had placed four signs on the highway, just prior to the 176 mile marker and the Sugartree exit. The first two signs stated, in both English and Spanish, that there was a checkpoint ahead, and two signs placed just after the first two indicated that drug dogs were in use. At the top of the Sugartree exit, there is a stop sign, but there are no businesses, gas stations, or other facilities. On the south side there is a service road going west, and on the north side there is a county road heading north.

At approximately 2:00 p.m., Dep. Pracht and Dep. Richardson were heading westbound on Highway 44 and were exiting at the Sugartree exit. They were in uniform and driving a marked patrol car. As they were crossing over the interstate at the Sugartree exit, Dep. Pracht saw a one-ton Chevy pickup truck heading up the exit ramp from eastbound I-44. The pickup truck was hauling a trailer which was carrying a 1956 panel van. At the top of the exit, the pickup truck came to a full stop, approximately four

feet past the stop sign and partially into the intersection. The pickup truck had its right-hand turn signal on, but it appeared as though the driver saw the patrol car and then proceeded straight across the highway to reenter Interstate 44.

Dep. Pracht followed and observed the wheels of the trailer cross the solid white line, or "fog line," on the right shoulder of the road by approximately 1½ feet, either as it was getting on the highway or shortly after it entered the highway. Believing that the pickup had committed a traffic violation both at the stop sign and by the lane violation, he activated his lights and initiated a traffic stop. Co-Defendant Johnnie Fleming was driving the pickup, and Defendant Gary Gray was riding as a passenger. Dep. Pracht left his patrol car and approached the driver, Fleming. He identified himself and advised Fleming that he had stopped him for committing a traffic violation by crossing over the white fog line. Fleming apologized and said he had not been paying attention. At this point, Det. Pracht was speaking to Fleming through the open driver's side window, and he detected what he believed to be a strong odor of burnt marijuana coming from the cab of the pickup. He asked to see Fleming's driver's license, and then asked him to step to the rear of the vehicle for safety reasons.

At the rear of the trailer, Dep. Pracht asked Fleming why he had exited the highway. Fleming responded that he was out of gas and was looking for a service station. Fleming appeared extremely nervous. His hands were shaking, he would not make eye contact, and he was very slow to respond. Although he knew that there was no such sign, Dep. Pracht, in order to test Fleming's veracity, asked whether Fleming had seen the

3

Texaco sign at the base of the exit ramp, and Fleming said yes, that was why he had exited there. At some point during their conversation, Fleming advised him that the panel van belonged to Defendant Gray, and that they had gone to Springfield where it had been purchased. Dep. Pracht told Fleming he had smelled marijuana, and Fleming said that there was a "roach," which is the butt of a smoked marijuana cigarette, in the truck. Dep. Pracht asked if he could conduct a search, and Fleming said yes. Dep. Pracht did not specifically state whether he wanted to search the pickup or the panel van.

     Dep. Pracht then approached the passenger side and asked Defendant Gray for identification. He looked at the gas gauge of the pickup and saw that there was just under half a tank of gas. He asked Defendant why they had exited the highway, and he responded that they were tired and looking for a motel. Dep. Pracht asked about the antique panel van they were towing, and Defendant said it belonged to Fleming. At the time, Defendant seemed nervous, but not as nervous as Fleming had been. He did not make eye contact and was slow to respond. Dep. Pracht told Defendant that he had smelled marijuana inside the truck, and Defendant also responded that they had a roach in the truck. Dep. Pracht also asked Defendant for consent to search, and Defendant gave his consent. He did not advise Gray or Fleming that they had a right to refuse to consent to a search. He asked them for keys to the panel van, and both denied having any keys to the van. Dep. Pracht observed that the windows of the panel van had been painted black on the inside, such that he was unable to look into the panel van.

Dep. Pracht called Sheriff Blankenship and asked him to respond to the scene. Sheriff Blankenship had just conducted a stop nearby and was just a few minutes away. He had his drug dog, Nitro, in his vehicle. Deps. Pracht and Richardson then conducted a brief search of the cab of the pickup, primarily for weapons. Dep. Richardson located some rolling papers, but they did not locate the roach or any marijuana in the pickup. Sheriff Blankenship arrived approximately 7-8 minutes after the initial stop and began to walk Nitro around the truck and trailer.

In the meantime, Dep. Pracht placed Fleming in his patrol vehicle and continued to talk to him. Fleming was not in handcuffs at the time, but Dep. Pracht did not consider that he was free to leave. Dep. Pracht saw Nitro alert at the back of the trailer and panel van. After he observed the alert, Dep. Pracht advised Fleming that the drug dog had alerted and said he felt strongly that something was going on. Fleming responded that they had about 1,000 pounds of marijuana in the panel van that they were taking from Arizona to Columbus, Ohio. He said Defendant Gray was the primary source of the marijuana, and that there were two other owners who were following behind them in a grey Intrepid vehicle. Fleming said that he was being trained by Gray how to transport marijuana, and that for his part he was to receive $20,000. He believed that Gray was to receive $30,000-$40,000.

Dep. Pracht advised Sheriff Blankenship of what Fleming had said, and Fleming and Gray were placed under arrest, handcuffed, and transported to the Sheriff's Office. The pickup and trailer were seized and were driven by Dep. Pracht to the Sheriff's

5

Office, which was approximately five miles down the highway. At some point, the timing of which is unclear, Dep. Pracht issued a written warning for the traffic violation. Although Dep. Pracht was unsure at the hearing whether the warning also included the stop sign violation, the written warning produced after the hearing at Defendant's request is only for the lane violation. (Doc. No. 41-2). Such warnings are not given to the driver, but rather are kept as part of the Sheriff's records.

At the Sheriff's Office, Dep. Pracht broke the vent window on the passenger side of the panel van and saw that the van was full of bundles of marijuana. From the time of the stop until the time he broke the window of the van, Dep. Pracht estimated that approximately 25 minutes had passed.

Det. Davis, the evidence technician, was called in to assist. After discussing the events with Dep. Pracht, Det. Davis began to search and process the vehicles. He photographed, counted, and weighed the bundles, which totalled slightly more than 1,400 pounds. From the inside of the pickup, he seized a computer generated map, which mapped a route from Ohio to Tucson, Arizona, and a number of receipts from which he could reconstruct their travel. Each of the Defendants' personal belongings were left for Det. Davis by other officers who had seized them, and from a jacket with Defendant Gray's belongings, Det. Davis seized a title to the panel van and a bill of sale, both of which were left open as to the purchaser.

**CONCLUSIONS OF LAW**

A.  **The Vehicle Stop**

1.  Basis for the Stop

Defendant's first contention is that Deputy Pracht lacked probable cause for the traffic stop. The case law is clear: When a police officer observes a traffic violation – however minor – he has probable cause to stop the vehicle. Whren v. U.S., 517 U.S. 806 (1996); United States v. Martin, 411 F.3d 998, 1000 (8th Cir. 2005). Deputy Pracht detained the driver for stopping beyond the stop sign and for failure to stay within his traffic lane. The evidence is undisputed that the pickup came to a stop four feet beyond the stop sign, extending partially into the intersection. It is also undisputed that the Deputy observed the back wheels of the trailer swerve outside the right-hand fog line as the driver was attempting to reenter the highway.

Defendant has asserted that there is no state statute that mandates that a car stop even with a stop sign. Defendant also contends that Dep. Pracht conceded that the vehicle did not violate R.S. Mo. § 304.015.5(1), which states: "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

With regard to the lane violation, the record does not support Defendant's contention. Dep. Pracht did not concede that no violation of R.S. Mo. § 304.015.5(1) or other state law violation occurred. To the contrary, while he did not know what precise

7

statute addressed the situation, Dep. Pracht unequivocally and repeatedly testified that he believed a lane violation had occurred when the driver failed to stay within his lane. Nor did he testify that such occurrences were common, as Defendant asserts at page two of his post-hearing memorandum. Inasmuch as there is no dispute that the wheels of the trailer crossed over the white line to the right of the lane and then crossed back over as it entered onto the highway, the Court finds that a violation of R.S. Mo. § 304.015.5(1) did occur, and that Dep. Pract was correct in determining that the driver had committed a lane violation. United States v. Pulliam, 265 F.3d 736, 739 (8th Cir. 2001) (holding similar Arkansas statute violated where defendant's wheels crossed over fog line); accord State v. Pike, 162 S.W.3d 464, 473 (Mo. 2005) ("transgressions over the fog line" provide reasonable suspicion to believe traffic violation occurred).

      Likewise, it was reasonable for Dep. Pracht to determine that a traffic violation had occurred when the driver first came to a stop four feet beyond the stop sign. Dep. Pracht could not say for certain that there was a white line at the stop sign or point to a specific statute that mandates that a driver stop evenly with a stop sign. As the government notes, however, R.S. Mo. § 300.270.2, in pertinent part states:

> [E]very driver of a vehicle approaching a stop sign intersection indicated by a stop sign shall stop before entering the crosswalk on the near side of the intersection or, in the event there is no crosswalk, shall stop at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection.

If there was a white line, the driver plainly violated this statute. And if there was no

white line, on this record it appears that the statute was still violated, as the intersection was open, thereby providing a clear view even before the stop sign, and the evidence is undisputed that Fleming stopped four feet into the intersection.

Even if Dep. Pracht was incorrect in his assessment that the driver's actions constituted traffic violations, it was reasonable for him to believe these actions were violations, and his reasonable but mistaken belief that traffic violations had occurred provided probable cause to stop the pickup truck. See Martin, 411 F.3d at 1001 (even if officer was mistaken that driving with one defective brake light was a code violation, stop was valid as the officer's actions were objectively reasonable); United States v. Clayborn, 339 F.3d 700, 701 (8th Cir. 2003) (officer's reasonable but mistaken belief that defendant was driving without license plate provided probable cause for traffic stop), cert. denied, 541 U.S. 1019 (2004); United States v. Peltier, 217 F.3d 608, 610 (8th Cir. 2000) (fact that officer's belief regarding license plate proved to be mistaken does not negate finding of probable cause); United States v. Allegree, 175 F.3d 648, 650 (8th Cir.) (stop of vehicle lawful based on officer's reasonable belief, though mistaken, that vehicle's headlights violated state statute), cert. denied, 528 U.S. 958 (1999). Moreover, that Dep. Pracht was unsure of the precise statute violated is not controlling, as an arrest is lawful if, in light of the objective evidence, there is probable cause to believe that the subject violated any applicable statute, even one not contemplated by the officer at the moment of arrest. Lawyer v. City of Council Bluffs, 361 F.3d 1099, 1106 (8th Cir. 2004); see also, United States v. Sherrill, 27 F.3d 344, 346-47 (8th Cir. 1994) (probable cause

9

existed though police officers did not believe they had probable cause and did not apply for arrest warrant).

    2. <u>Scope of the Stop</u>

Once an officer has a right to stop a driver, the officer may "conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" <u>Bloomfield</u>, 40 F.3d at 915 (quoting <u>Cummins</u>, 920 F.2d at 502). "This reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." <u>Id.</u>; <u>United States v. Jones</u>, 269 F.3d 919, 924-5 (8th Cir. 2001). Dep. Pracht was therefore authorized to advise Fleming of the violation, ask him to step out of the truck, obtain his driver's license, and inquire about their destination. <u>United States v. Pulliam</u>, 265 F.3d 736, 740 (8th Cir. 2001); <u>United States v. Winters</u>, 221 F.3d 1039, 1041 (8th Cir. 2000); <u>United States v. Barahona</u>, 990 F.2d 412, 416-7 (8th Cir. 1993).

The law is also clear that when "'the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'" <u>United States v. Johnson</u>, 58 F.3d 356, 357 (8th Cir.), <u>cert. denied</u>, 516 U.S. 936 (1995) (quoting <u>Barahona</u>, 990 F.2d at 416). Police officers may briefly detain an individual for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). The reasonable belief requires suspicion based on "'particularized,

10

objective facts which, when taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983).

When an officer develops reasonable, articulable suspicion of criminal activity during a traffic stop, he is justified in making a greater intrusion unrelated to the traffic offense. Pereira-Munoz, 59 F.3d at 791; Bloomfield, 40 F.3d at 918. Officers are "permitted 'to graduate their responses to the demands of the particular situation.'" Pereira-Munoz, at 791 (quoting United States v. Place, 462 U.S. 696, 710 n.10 (1983)). The reasonable suspicion is assessed in light of the totality of the circumstances, taking into consideration the officers' experience. Id.

> The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. . . . [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

Florida v. Royer, 460 U.S. 491, 500 (1983). See Bloomfield at 916; United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992).

The Court rejects Defendant's contention that Dep. Pracht expanded the scope of the traffic stop without reasonable suspicion, acting on no more than hunch. When Dep. Pracht approached the open passenger window to speak to the driver, he detected the odor of burnt marijuana. At this point, the traffic stop had not ended. This, alone, would

provide a sufficient basis not only for a further detention and investigation, but for arrest. United States v. Chauncey, 420 F.3d 864, 871 (8th Cir. 2005), cert. denied, 126 S.Ct. 1480 (2006). In addition to the odor of burnt marijuana, however, Fleming's behavior was excessively nervous, he offered a reason for exiting the highway that appeared to have no factual basis, and he then provided an untrue answer regarding having seen the gas station sign. Thereafter, Fleming and Gray provided conflicting answers with regard to their reason for exiting the highway and the ownership of the panel van. They both also denied having any keys to the panel van, although it had just supposedly been purchased. In addition, each separately admitted that there was a "roach" in the truck.

In light of these facts, and having detected the odor of marijuana coming from the pickup, it was reasonable for Dep. Pracht to detain Fleming and Gray longer for further inquiry and to request consent to search. United States v. Blaylock, 421 F.3d 758, 769 (8th Cir. 2005) (passenger's extreme nervousness, combined with presence of masking odors, contradictory statements, and driver's vague reasons for trip, provided reasonable cause to detain vehicle for canine search), cert. denied, 126 S.Ct. 1108 (2006); accord United States v. Poulack, 236 F.3d 932, 935-6 (8th Cir.), cert. denied, 534 U.S. 864 (2001); United States v. Lyton, 161 F.3d 1168, 1170-71 (8th Cir. 1998). It was also reasonable for Dep. Pracht to further extend the scope of the stop to request a drug canine, especially where, as here, he knew that canine could arrive at the scene within minutes. Martin, 411 F.3d at 1002 (brief delay to conduct canine sniff does not violate Fourth Amendment even where delay is after conclusion of traffic stop). Because Dep.

Pracht's investigative detention did not violate the Fourth Amendment, Defendant's argument that the search was the product of an illegal seizure has no merit. Lyton, 161 F.3d at 1171; United States v. Miller, 20 F.3d 926, 930 (8th Cir.), cert. denied, 513 U.S. 886 (1994). The narcotics found as a result of the search were lawfully obtained as long as either the occupants voluntarily consented to the search or there was probable cause. Id.

### B. **Search of the Pickup and the Panel Van**

1. Consent to Search

It is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given. United States v. White, 81 F.3d 775, 780 (8th Cir.) cert. denied, 519 U.S. 1011 (1996); Miller, 20 F.3d at 930. The consent, however, need not necessarily be knowing and intelligent. Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973). One need not be aware of his or her right to consent in order to make the consent voluntary. United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990).

A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given. Chaidez, 906 F.2d at 381. Voluntariness is a fact question to be determined from the totality of the circumstances present. Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415 U.S. 164 (1964). The factors to be considered in determining whether consent is

13

voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

Alcantar, 271 F.3d at 737. See United States v. Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997); Chaidez, 906 F.2d at 381. Among the factors to be considered in examining the environment surrounding the consent, courts examine: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred. United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001); Chaidez at 381. The foregoing factors are not to be applied mechanically, and no single factor is dispositive. Schneckloth, 412 U.S. at 226-27; Chaidez, at 381.

Applying the above factors, the government has met its burden to establish that the consent was voluntary. On this record there is nothing to suggest that either Fleming or Defendant Gray's will was overborne. Poulack, 236 F.3d at 936; Miller, 20 F.3d at 930. Per the court file, at the time of the incident Fleming was 50 years old and Defendant Gray was 57. There is nothing in this record to suggest that either of the occupants were

14

under the influence or unable to understand what was transpiring, and both men provided responsive answers. The encounter took place in the middle of the day, in a public area, and lasted only a few minutes, and no threats or promises were made to induce either to consent. While neither Defendant nor Fleming had been read his Miranda rights or advised of his right to withhold consent, neither are required for valid consent to search. United States v. Lyton, 161 F.3d at 1171; United States v. Payne, 119 F.3d 637, 643-44 (8th Cir.), cert. denied, 522 U.S. 987 (1997). "No 'presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate.'" United States v. Montano-Gudino, 309 F.3d 501, 504 (8th Cir. 2002), quoting United States v. Drayton, 536 U.S. 194, 207 (2002). As in Montano-Gudino, "there is no evidence other than the detention itself that the consent was not freely and voluntarily given." Id. Based on the totality of the circumstances surrounding the encounter, the Court concludes that both Fleming and Defendant Gray voluntarily consented to a search.

Defendant further asserts that even if Dep. Pracht had consent to search the pickup, that consent did not extend to the panel van they were towing. Defendant cites case law to the effect that when consent is given to search for a specific item, an officer may only search where that item reasonably may be found. But Dep. Pracht's suspicion was not limited to a "roach," and he did not request consent to search for a roach, per se. Rather, after both Defendants offered the existence of a roach as their explanation for the odor he detected, Dep. Pracht merely asked if it was okay for him to search the vehicle.

15

And in requesting consent, he did not expressly limit the request to the cab of the pickup.

Even if his original request to search was focused on the pickup, he specifically asked Defendant and Fleming for keys to the panel van in connection with his consent search. Neither Defendant nor Fleming objected or stated that his consent was limited to the pickup; rather, they denied having a key. The test for measuring the scope of the consent is one of objective reasonableness, "what would the typical reasonable person have understood by the exchange between the officer and the individual." United States v. Adams, 346 F.3d 1165, 1171 (8th Cir. 2003). On these facts, Dep. Pracht was reasonable in his belief that the consent search extended to the panel van.

2. Probable Cause to Search the Van

The search of the panel van, however, does not depend upon the consent of either Fleming or Defendant Gray. Dep. Pracht had detected the strong odor of burnt marijuana coming from the pickup, and both men had admitted having a roach in the truck. As such, Dep. Pracht had probable cause to search the vehicle. Chauncey, 420 F.3d at 871 (strong odor of marijuana emanating from inside of vehicle sufficient for arrest); Clayborn, 339 F.3d at 702 (smell of marijuana provided probable cause to search vehiclel); Peltier, 217 F.3d at 610 (same). In such circumstances, the officers may search the entire automobile, including the trunk area, and any items or containers found in the automobile. United States v. Ross, 456 U.S. 798, 823-825 (1982).

Even if Dep. Pracht lacked consent or probable cause to search the panel van prior to the arrival of Sheriff Blankenship, the officers obtained probable cause to search and

16

seize the panel van based upon the alert by the drug dog and Fleming's admission to Dep. Pracht that there was more than 1,000 pounds of marijuana in the van. United States v. Sanchez, 417 F.3d 971, 976 (8th Cir. 2005) (drug dog's identification of drugs in car provides probable cause for warrantless search). While Defendant asserts that the government has not shown that the drug dog was certified and reliable, even if that were so, probable cause here does not depend solely on the drug dog alert. Based on the totality of the circumstances, including Fleming's nervous behavior, his untruthful answers, the Defendants' inconsistent responses, the odor of marijuana, Defendants' admissions that there was a "roach" in the truck, and – most importantly – Fleming's own admission that there was more than 1,000 pounds of marijuana in the van,[1] the officers had more than sufficient probable cause to search and seize the panel van. As such, there is no basis to suppress the marijuana found in the panel van or the other items seized from the interior of the pickup.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence (Doc. No. 25) be **denied**.

---

[1] Defendant Gray asserts that Fleming's statement was taken in violation of Fleming's rights under Miranda v. Arizona. The Court disagrees that the questioning of Fleming at that point was custodial, such that Miranda warnings would be required. See Martin, 411 F.3d at 1003. In any event, however, Defendant Fleming has not moved to suppress any statements made by him, and Defendant Gray has no standing to assert the Fifth Amendment violation of another.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 30th day of May, 2006.